**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────

GAVIN C. THOMAS,

                              Plaintiff,

     v.                                                 No. 9:17-CV-1023
                                                   (GLS/CFH)

DELANEY, et al.,

                              Defendants.

─────────────────────────────────────

**APPEARANCES:**

Gavin C. Thomas
16-A-0095
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, New York 12051
Plaintiff pro se

Attorney General for the               JOHN F. MOORE, ESQ.
State of New York                       Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Gavin Thomas ("Thomas"), an inmate who was, at all relevant times, in

the custody of the New York Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Corrections

─────────────────

    [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(c).

Officers ("C.O.") Delaney, Dupra, LaValley, Stoughton and Crowningshield for violations of his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  Dkt. No. 45 ("Sec. Am. Compl.").  Presently before the Court is Defendants' motion for summary judgment.  Dkt. No. 55.  Thomas opposed the motion, and Defendants filed a reply.  Dkt. Nos. 60, 64.  For the following reasons, it is recommended that Defendants' motion for summary judgment be granted in part and denied in part.

## I. Background

### A. Facts[2]

In support of the motion, Defendants filed a Statement of Material Facts.[3]  The facts are

---

[2] The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents.  Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion.  See U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y.  May 18, 2010) (citing Daniel v. Unum Provident Corp., 261 F. App'x 316, 319 (2d Cir.  2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)).  In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in non-moving party's favor.  Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

[3] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.  The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

reviewed in the light most favorable to Thomas as the non-moving party.  <u>See</u> subsection

II.A.1 <u>infra</u>.  At the time of the incidents described in the Second Amended Complaint,

Thomas was confined at Clinton Annex Correctional Facility ("Clinton C.F.").  <u>See</u> <u>generally</u>,

Sec. Am. Compl.  Thomas, an inmate who identifies as an adherent of the Rastafarian faith,

entered Clinton C.F. in February 2016.  Dkt. No. 55-2 at 161, 172-73.[4]

DOCCS Directive # 4914 ("Dir. #4914"), revised as of July 6, 2015, entitled Inmate

Grooming Standards, was in effect at the time of the incidents described in the Second

Amended Complaint.  Dir. #4914 provides, in relevant part (Section III(B)(2)(a)):

> Hair may be permitted to grow over the ears to any length desired by the inmate.  The hair must be neatly groomed and kept clean at all times.
>
> The only braids allowed are the corn row style.  Corn row braids may only be woven close to the scalp in straight rows from the forehead to the back of the neck and braids may not extend beyond the hairline.  No designs or symbols may be woven into the hair.
>
> The dreadlock hairstyle is allowed.  When worn, dreadlocks must extend naturally from the scalp and may not be woven, twisted, or braided together forming pockets that cannot be effectively searched.  Inmates wearing below shoulder length dreadlocks must tie them back in a ponytail with barrette, rubber band, or other fastening device approved by the Superintendent.  Note: Inmates of the Rastafarian religious faith may wear their dreadlocks in an approved religious headcovering.[5]

---

Local Rule 7.1(a)(3).

[4] Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

[5] Dir. #4914 was further revised on March 26, 2018, but that revision did not change the relevant provisions.  Dkt. No. 55-8 at 2.

Dkt. No. 55-8 at 2, 9.

### 1. Factual Allegations Related to Delaney

On February 15, 2016, Defendant C.O. Delaney ("Delaney") issued a misbehavior report charging Thomas with creating a disturbance, harassment, and refusing a direct order. Dkt. No. 55-2 at 22; Dkt. No. 55-3 at 6. In the report, Delaney stated:

> On the above date and approximate time, I attempted to counsel Inmate Thomas, G (16A0095) on inmate grooming standards. The inmate became argumentative. I gave the inmate a direct order to bring his hair into compliance. I then allowed the inmate to go to chow. He was stopped due to a keeplock in process in the hallway. The inmate returned to the doorway and was watching the incident through the window. I gave the inmate (2) direct orders to leave the doorway before he complied. The inmate returned to my desk and immediately started to argue with me over his unallowed hair style. The inmate was disrespectful. He then stated, "I have to get you to understand the common sense of this." During this verbal confrontation the inmate admitted he had been counseled previously on his hair style. There were (18) inmates on the dorm when the occurred. They all were standing watching our verbal confrontation.

Dkt. No. 55-2 at 22; Dkt. No. 55-3 at 6.

At the time of the incident, Thomas was "trying to start [his] dreads" and wore his hair in "braids." Dkt. No. 55-2 at 180. Thomas was placed in keeplock confinement pending a disciplinary hearing. Id. at 27, 181. On the same day that he received the ticket, Thomas removed his braids. Id. at 181. Thomas testified that he removed his braids because Delaney threatened him with continued keeplock confinement. Id.

On February 18, 2016, Lieutenant Rock ("Rock")[6] presided over a disciplinary hearing

---

[6]    Rock is not named as a defendant in this action.

related to the misbehavior report.  Dkt. No. 55-2 at 18-21, 26-32, 183.  Plaintiff plead "not

guilty" and told Rock that he attempted to explain to Delaney that he was Rastafarian.  Id. at

29.  Thomas was found guilty of creating a disturbance and refusing a direct order.  Id. at 18.

Rock imposed a penalty consisting of fifteen days loss of recreation, packages, commissary,

and telephone privileges.  Id. at 18, 186.

In March 2016, Plaintiff filed a grievance (CLA-7172-16).  Dkt. No. 55-2 at 189; Dkt. No.

55-9 at 15-16.  In the grievance, Plaintiff stated:

> I arrive[d] here at Clinton Annex Feb. 12 2016[,] on Feb. 16
> 2016 C.O. Delaney stopped me walking out the door for chow
> he then started to question me asking me about my hair saying
> that my hair was not the way it suppose to be[.] [H]e said that
> my hair can not go pass my hair line on the back of my neck.
> Then he had me placed in the box or keep lock (11-A2) and
> said I was harrassing [sic] his.  I am being harrassed [sic]
> about my hair everytime I fixed it another C.O. has a different
> thing to say about it telling me to cut it off.  I am Rastafarian
> and it is against my belief to cut my hair.  On 3-14-16 a C.O.
> came on my visit while I was with my girl friend and he started
> to harrass [sic] me again.  I never was told or shown any rule
> [in] regards to the way you can have your hair but I'm being
> treated as if I have disciplinary problems when its only hair.  I
> just want to get to the end of this or I will take things to the
> higher ups attention.  The rule is arbitrary.  It is not fair and I
> just wanted to be treated such as.  Look forward to a response
> thank you for your time and consideration.

Dkt. No. 55-2 at 36-37; Dkt. No. 55-9 at 15-16.

On March 29, 2016, the Inmate Grievance Review Committee ("IGRC") issued a

response:

> The grievant is advised pursuant to CAY-13419-03; CORC
> asserts that braided hair which extends beyond the hairline is
> not allowed.  The grievant may wear long, unbraided hair in a
> ponytail, in accordance with Dir. #4914.

Dkt. No. 55-2 at 38; Dkt. No. 55-9 at 17.

On or about March 29, 2016, Thomas appealed the IGRC's decision.  Dkt. No. 55-9 at

17.  On April 5, 2016, the Superintendent issued a decision which read:

> The grievant alleges that he received an improper misbehavior
> report for having braids past his hairline.
>
> An investigation has revealed that the grievant received a
> misbehavior report on 2/15/16 concerning this issue, he may
> appeal in accordance with Directive #4932.   Pursuant to
> Directive #4914, braids may not extend beyond the hairline.
> Dreadlocks or long hair may be worn beyond shoulder length,
> however, it must be tied back in a ponytail.
>
> Upon conclusion of the investigation the grievant's allegations
> are   unsubstantiated   and   there   is   no   evidence   of   staff
> malfeasance.

Dkt. No. 55-2 at 40; Dkt. No. 55-9 at 19.

On April 7, 2016, Thomas appealed the Superintendent's decision to the Central Office

Review Committee ("CORC").  Dkt. No. 55-2 at 195; Dkt. No. 55-9 at 19.  Thomas claimed:

> I am not appealing misbehavior report.  I am appealing the
> C.O.'s misconduct after I received a misbehavior report after
> 2/15/16 also the way inmates are allowed to wear their hair as
> far as braids being past hairline because the back of your neck
> is not a hairline[.]   [T]he hairline is on top of your forehead.
> And this rule does not give other options for people thats [sic]
> growing their hair besides leaving it out to get nappy or
> damaged to fall out which will happen to African-American hair.
> My hair is to [sic] long to stop on the back of my neck which the
> C.O.'s are forcing me to do or leave it out.
>
> The rule on braided hair needs to be more specific on the way
> hair growers are allowed to wear as far as braids.  There is no
> way my hair would stop on the back of my neck because of the
> length regardless of hair style.

Dkt. No. 55-2 at 40, 195-96; Dkt. No. 55-9 at 17.

On July 20, 2016, CORC issued a decision, unanimously denying the appeal:

> Upon full hearing of the facts and circumstances in the instant

6

> case, the action requested herein is hereby denied. CORC upholds the determination of the Superintendent for the reasons stated.
>
> CORC asserts that corn row braids may only be woven close to the scalp in straight rows from the forehead to the back of the neck and braids may not extend beyond the hairline, in accordance with Directive #4914, III, B, 2, a. It is noted that the grievant was issued a Tier II MBR on 2/15/16 for creating a disturbance and a direct order. CORC notes that the enforcement of the standards of inmate behavior should not be construed as harassment by the grievant. CORC finds no malfeasance by staff.
>
> With respect to the grievant's appeal, CORC notes that inmates with long hair or dreadlocks below the shoulder must tie hair in a ponytail with barrette, rubber band or other approved fastening device.

Dkt. No. 55-2 at 34; Dkt. No. 55-9 at 13.

## 2. Factual Allegations Related to Dupra

On May 11, 2016, Defendant C.O. Dupra ("Dupra") issued a misbehavior report charging Thomas with violating prison rules related to false statements/information, an unreported "ID" change, and refusing a direct order. Dkt. No. 55-2 at 56; Dkt. No. 55-4 at 6.

On May 19, 2016, Lieutenant Rock presided over a disciplinary hearing related to the misbehavior report. Dkt. No. 55-2 at 51, 205. Upon completion of the hearing, Thomas was found guilty of an unreported ID change and received a penalty of fifteen days loss of recreation, commissary, telephone privileges, and packages. Id. at 51.

On May 23, 2016, Plaintiff filed a grievance (CLA-7217-16) stating, in pertinent part:

> My name is Gavin Thomas 16A0095 I[']m in 3/2/7[.] The C.O. that worked on 3-2 5/11/16 3 to 11 shift is forcing me to take off my religious crown for unknown reasons which I should not have to do unless I[']m being frisk[ed] or going threw [sic] a

7

> metal detector.  This C.O. also would not give me my
> commissary sheet and using my sheet as a bribe to take my
> religious crown first which is a violation of my rights.  I am
> Rastafarian and practicing my religion to the best of my abilities
> and it is not fair to be going through this oppression and C.O.'s
> over using their power.

Dkt. No. 55-2 at 64; Dkt. No. 55-9 at 31.

On June 7, 2016, the Superintendent issued a response stating , in pertinent part:

> The grievant alleges that he is being harassed by the building
> officer who made him remove his religious crown.

> An investigation has been conducted by a security supervisor.
> Upon interview the grievant reiterated his original complaint.
> The officer has denied the grievant's allegations.  The Officer
> issued the grievant a misbehavior report concerning this issue.
> The grievant may address this issue further via the disciplinary
> mechanism in accordance with Directive #4932.

Dkt. No. 55-2 at 65; Dkt. No. 55-9 at 32.

On June 11, 2016, Thomas appealed the Superintendent's decision to CORC.  Dkt. No.

55-2 at 65; Dkt. No. 55-9 at 32.  Thomas claimed, "[t]here was no legit reason to ask me to

remove my crown and the misbehavior report that was issued to me is proof.  I did not have a

hearing with Grievance Committee on this matter to show my documents."  Id.

On October 12, 2016, CORC issued a decision affirming the decision of the

Superintendent:

> Upon full hearing of the facts and circumstances in the instant
> case, the action requested herein is hereby denied as without
> merit.  CORC upholds the determination of the Superintendent
> for the reasons stated.

> CORC notes that Officer D . . . denied harassing and
> threatening the grievant on 5/11/16, or refusing to give him a
> commissary sheet.  He was issued a Tier II MBR for non-
> compliance with Directive #4914.  In addition, Chaplain O . . .
> met with the grievant regarding the proper head covering and

8

hair style. CORC has not been presented with sufficient evidence of malfeasance by staff, and advises him to address future similar concerns to the area supervisor for the most expeditious means of resolution.

With respect to the grievant's appeal, CORC notes that grievances alleging staff misconduct are forwarded directly to the Superintendent for investigation in accordance with Directive #4040, § 701.8. Therefore, no IGRC hearing is held. CORC asserts that the disciplinary appeal mechanism affords the opportunity to remedy any procedural errors in a disciplinary report, and notes that the grievant did not appeal the 5/11/16 Tier II disposition.

Dkt. No. 55-2 at 63; Dkt. No. 55-9 at 30.


### 3. Factual Allegations Related to LaValley

On October 20, 2017, Defendant C.O. LaValley ("LaValley") asked Plaintiff to remove his religious headwear/crown before he passed through the metal detector. Dkt. No. 55-2 at 218-19; Dkt. No. 55-5 ¶ 5. LaValley did not issue a misbehavior report. Dkt. No. 55-2 at 220; Dkt. No. 55-5 ¶ 7.

On October 26, 2017,Thomas filed a grievance (CLA-7785-17) claiming:

On October 20, 2017 after breakfast around 8:45 am each person in the dorm was told to walk through the metal detector. When I Gavin Thomas 16A0095 walked through the metal detector without ringing I was told to take off my religious crown by officer LaValley then he took my I.D. because of the dressing of my hair and stated he talked to me about such matter the day prior. I then told LaValley I was not the person he spoke to. I then tried to make him aware of my religious practices but he ignored, and told me to move along without giving my I.D. back. Then I was placed on the wall for additional frisk that consisted of excessive rough patting on my body by another officer. I am aware of hair and grooming directive, I don't think that Officer LaValley is aware that the hair and grooming directive states corn row braids are allowed. And I[']m not cutting my hair because it is against my religious

9

> beliefs which I am Rastafarian.   Even New York State
> Constitution of Religion free exercise states Rastafarians and
> Mohawks who attach important religious significance to hair
> length and style have constitutional exemption from hair
> regulations for prisoners and prison guards that conflict with
> their religious beliefs.  Also the removing of my crown by force
> is a violation of my constitution to free exercise of my religion.
> I will note that I already have a pending civil suit against officers
> here at Clinton Annex for these same issues which is clearly a
> form of harassment, I will add this matter to my suit.

Dkt. No. 55-2 at 78, 223; Dkt. No. 55-9 at 45-46.

On October 31, 2017, the IGRC denied the grievance.  Dkt. No. 55-2 at 80; Dkt. No 55-9

at 47.   On November 2, 2017, Plaintiff appealed the IGRC decision.  Dkt. No. 55-2 at 81;

Dkt. No. 55-9 at 48.

On November 9, 2017, LaValley drafted a memorandum related to Grievance CLA-7785-

17.  Dkt. No. 55-9 at 50.  LaValley stated:

> On October 20, 2017, as Inmate Thomas 16A0095 was about
> to walk through the metal detector, I instructed him to remove
> his religious headwear.  Inmate Thomas was instructed to
> empty his pockets and place all items on the frisk table.  Inmate
> Thomas placed his ID card on the table and [it] was given back
> to him after he passed through the metal detector.  At no time
> did I wittness [sic] any staff member pat frisk said inmate in an
> unprofessional manner.

Dkt. No. 55-9 at 50.

Thomas claims that, on November 9, 2017, LaValley stopped him and called him

inappropriate names.  Dkt. No. 55-2 at 227.  Thomas testified that LaValley threatened him

and said, "you like putting things on paper, do it again and see what happens[.]"  Id.  LaValley

does not deny interacting with Thomas on November 9, 2017, but claims that he did not

threaten Thomas or call him any derogatory names.  Dkt. No. 55-5 at ¶ 11.

On or about November 10, 2017, Thomas attempted to file a grievance related to his

10

November 9, 2017 interaction with LaValley.  Dkt. No. 55-2 at 92, 230-31.  Thomas claimed

that LaValley threatened him and as a result, he did not feel safe in LaValley's presence.  Id.

at 92.  Thomas did not receive a response.  Id.  Two months later, Thomas re-submitted his

grievance.[7]  Id. at 232-33.  Thomas did not receive a response.  Id. at 233.  Thomas did not

write to the Superintendent or to CORC regarding his November 10, 2017 grievance.  Dkt.

No. 55-2 at 233.

On December 27, 2017, the Superintendent issued a decision denying Grievance No.

CLA-7785-17.  Dkt. No. 55-2 at 82; Dkt. No. 55-9 at 49.  On January 23, 2018, Thomas

appealed the decision to CORC.  Dkt. No. 55-2 at 82, 226; Dkt. No. 55-9 at 49.  The decision

from CORC is pending.  Dkt. No. 55-2 at 226.


### 4.  Factual Allegations Related to Stoughton

On February 18, 2018, Defendant C.O. Stoughton ("Stoughton") issued a misbehavior

report charging Thomas with violating prison rules related to false statements/information,

untidy cell/person, and refusing a direct order.  Dkt. No. 55-2 at 98; Dkt. No. 55-7 at 5.

Stoughton reported:

> On the above date & approximate time while covering the lunch
> chow run.  Inmate Thomas 16A0095 12-2-45 passed through
> the 460 gate with an illegal hair style.  As he was being pat
> frisked before going to a visit, I spoke to Inmate Thomas about
> his hair being illegal.  Inmate Thomas stated, "I'm Rasta, and
> I can wear my hair any way I want."  I then asked Inmate
> Thomas if he had any paperwork stating such.  Inmate Thomas
> stated "I have a Religious exemption.  Look it up."  I asked him
> to produce to me the religious exemption.  Inmate Thomas
> could not do so.  He stated again "I'm Rasta, I can wear my

---

[7] Thomas does not specify when, how, or where he re-submitted the grievance.

11

> hair anyway I want."  I informed Inmate Thomas that just because he was Rastafarian, that didn't mean that he did not have to follow Directive 4914.  He stated "I'm not changing my hair."  Directive 4914 Page 4 Section 2 Letter A states that corn rows may be braided, straight back and to end at hairline. They may not extend past the hairline or tied together in a bun. Inmate Thomas' hair was corn rows that exceeded the max length, looped back up and wore tied in a bun.

Dkt. No. 55-2 at 98; Dkt. No. 55-7 at 5.

Thomas received the report on February 19, 2018 and was placed in keeplock confinement pending the disciplinary hearing.  Dkt. No. 55-2 at 98, 100, 235.  Thomas was released from keeplock, after twenty-four hours.  Id. at 235.  Thomas testified that he was released because he took his hair out of corn rows.  Id. at 235, 239.

On February 20, 2018, Lieutenant Kramer ("Kramer")[8] presided over a disciplinary hearing related to the misbehavior report.  Dkt. No. 55-2 at 94, 242-43.  During the hearing, Thomas testified that he attempted to explain to Stoughton that he had an exemption for "long hair style based on my religion."  Id. at 106.  Thomas reiterated the significance of hair length and style relevant to the Rastafarian religious beliefs.  Id. at 108.  At the completion of the hearing, Thomas was found guilty of false statements and maintaining an untidy cell or person.  Id.  Thomas received a penalty of fifteen days loss of recreation, packages, commissary, and telephone.  Dkt. No. 55-2 at 94.

Thomas appealed the disciplinary determination claiming that he did not violate prison rules.  Dkt. No. 55-2 at 113-14, 250.  On April 18, 2018, Captain DeLutis[9] affirmed the decision.  Id. at 251.  Thomas further appealed the determination to Anthony Annucci.  Dkt.

---

[8] Kramer is not a defendant in this action.

[9] DeLutis is not a defendant in this action

12

No. 60-2 at 28.   On June 6, 2018, Thomas was advised that, "[t]here is no provision for a review of Tier II Hearings at this level." Id. at 30.

### 5. Factual Allegations Related to Crowningshield

On May 21, 2018, Thomas filed a grievance (CLA-7797-18) complaining of an incident that allegedly occurred on May 18, 2018.  Dkt. No. 55-9 at 59-60.  Thomas claimed that Defendant C.O. Crowningshield ("Crowningshield") confiscated his identification "for retaliation purposes." Id.  Thomas claimed, "[t]he officers that I have a pending suit against give other officers here at Clinton Annex motivation and other motives to retaliate against me[.]" Id. at 60.

On May 24, 2018, Crowningshield responded to the allegations in a memorandum:

> On 5-18-18 C.O. Crowningshield was working in the north yard and made an announcement over the P.A. system to line up in front of your building signs and prepare for the go back. Thomas was lined up with the wrong building.  I approached him to get his ID to verify who the Inmate was.  I then counseled Inmate Thomas about lining up with the right building and then gave him his ID back.  At no time did I threaten Inmate Thomas nor did I state that if I see him outside again it will be the last time anyone see him.  I know nothing about a lawsuit he may have pending. I acted in a professional manner the entire time and I deny all accusations against me.

Dkt. No. 55-6 ¶¶ 5-8.

On June 8, 2018, the Superintendent issued a response denying the grievance.  Dkt. No. 55-2 at 118; Dkt. No. 55-9 at 61.  On June 21, 2018, Thomas appealed the Superintendent's decision. Id.  CORC has not issued a decision related to the grievance.  Dkt. No. 55-2 at 265; Dkt. No. 55-9 ¶ 28.

13

## II.  Discussion

### A. Legal Standards

### 1.  Motion for Summary Judgment

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 317, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party.  Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must

14

> be construed "liberally,". . . and that such submissions must be read to
> raise the strongest arguments that they "suggest," . . . .  At the same time,
> our cases have also indicated that we cannot read into pro se submissions
> claims that are not "consistent" with the pro se litigant's allegations, . . . or
> arguments that the submissions themselves do not "suggest," . . . that we
> should not "excuse frivolous or vexatious filings by pro se litigants," . . . and
> that pro se status "does not exempt a party from compliance with relevant
> rules of procedural and substantive law.

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

## 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts.  See N.D.N.Y. L.R. 7.1(a)(3).  "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue."  Id.  The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs."  Id.  "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  Id. (emphasis omitted).

Thomas filed a response Defendants' Statement of Material Facts and denied some of Defendants' assertions.  Dkt. No. 60.  Defendants argue that because Plaintiff has failed to include citations to the record or other evidence to substantiate his denials, the facts set forth in their Statement of Material Facts must be deemed admitted. Dkt. No. 64-1 at 6-7.  The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute."  Prestopnik v. Whelan, 253 F.Supp.2d 369, 371 (N.D.N.Y. 2003).  Although

15

Defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit.  N.D.N.Y. L.R. 7.1(a)(3); see subsection II.A.1 supra.   Accordingly, in deference to plaintiff's pro se status, the Court will independently review the record when evaluating defendants' Motion for Summary Judgment, and "treat plaintiff's opposition as a response to" defendants' Statement of Material Facts.  Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to Plaintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement."); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgment.").

## B. Exhaustion

Defendants argue that the motion for summary judgment must be granted on the following: (a) claims against Stoughton; (b) claims related to the November 9, 2017 incident with LaValley; and (c) and retaliation claims against Delaney, Dupra, LaValley, and Stoughton because Thomas failed to exhaust his administrative remedies through available

grievance procedures.[10]  Dkt. No. 55-11 at 14.

The Prison Litigation Reform Act ("PLRA") requires that an individual exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006); Baez v. Parks, No. 02-5821, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) (citation omitted) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees.").  The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter, 534 U.S. at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  Id. at 524.  To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated.  See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted).  The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement."  Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016).  Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent

---

[10] Defendants do not allege that Thomas failed to exhaust his administrative remedies related to the following claims: (1) First Amendment religious claims and RLUIPA claims against Delaney, Dupra, and LaValley (related to the October 2017 incident); and (2) retaliation claims against Crowningshield.

with the statutory requirements of the PLRA.  Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[11]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion."  Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner.  Id.  The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Id. at 1860.

## 1. Did Plaintiff Exhaust his Administrative Remedies?[12]

---

[11] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123.  The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."  Id. (citing Ross, 136 S. Ct. at 1858-59).

[12] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a)(1).  An IGP representative has sixteen calendar days to informally resolve the issue.  Id. § 701.5(b)(1).  If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing.  Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  Id. § 701.5(c)(1).  If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination.  Id. §§ 701.5(d)(i)-(ii).  CORC must "review each appeal, render a decision

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F. Supp. 2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

Here, Thomas admits that he did not file a grievance against Stoughton. Dkt. No. 60-1 at 8-9. Thomas also does not dispute that he failed to exhaust his administrative remedies related to any claims arising from the November 9, 2017 incident with LaValley. Id. at 11-12. In response to Defendants' arguments regarding the failure to exhaust retaliation claims, Thomas asserts that he is not pursuing retaliation claims against Delaney or Dupra. Id. at 13, 15. Thomas did not respond to Defendants' arguments related to his failure to exhaust retaliation claims against LaValley and Stoughton.[13]

---

on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.

[13] During his deposition, Thomas testified that he was not asserting a retaliation claim against LaValley. See Dkt. No. 55-2 at 277, 282. In opposition to the motion, Thomas claims that LaValley harassed him on November 9, 2017 "[o]stensibly, [in] retaliation against Plaintiff for a grievance he wrote on 10/20/17." Dkt. No. 60-1 at 11. Thomas concedes however, that he did not exhaust a grievance related to the November 9, 2017 incident. Thomas filed a grievance after the October 2017 incident with LaValley, but that grievance does not reference retaliation. Dkt. No. 55-2 at 78, 223; Dkt. No. 55-9 at 45-46.

Therefore, Defendants have met their burden of showing that Thomas has failed to exhaust his administrative remedies with respect to the aforementioned claims.

### 2. Availability of Administrative Remedies

Thomas proffers a series of arguments suggesting that administrative remedies were unavailable to him.  See generally Dkt. No. 60-1.

### a. Disciplinary Appeal

Thomas admits that he did not file a grievance against Stoughton, but claims that he exhausted his administrative remedies when he filed an appeal of the Tier II disciplinary determination.  Dkt. No. 55-2 at 113-14, 251; Dkt. No. 60-1 at 8-9.   The undersigned is not persuaded by Thomas' argument.

 Courts in this District have held that "[t]hough a disciplinary appeal is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, 'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.'"  Barker v. Smith, No. 16-CV-76, 2017 WL 3701495, at *3 (S.D.N.Y. Aug. 25, 2017) (quoting Scott v. Gardner, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003), on reconsideration in part, 344 F. Supp. 2d 421 (S.D.N.Y. 2004), and on reconsideration in part, 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005) ); see also Labounty v. Johnson, 253 F. Supp. 2d 496, 501 (W.D.N.Y. 2003) ("An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance.").   For example, "[w]here the inmate is asserting both

retaliation claims and procedural due process claims, he must separately exhaust both types of claim, using the procedure appropriate to each type of claim." Johnson v. Fraizer, No. 16-CV-6096, 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) (citing, inter alia, Washington v. Chaboty, No. 09 CIV. 9199, 2015 WL 1439348, at *7 (S.D.N.Y. Mar. 30, 2015) ("In certain circumstances, however, courts have deemed a disciplinary appeal inadequate to exhaust a claim under the PLRA. Inmate Grievance Program exhaustion has been required, for example, where an inmate alleges retaliation, including retaliation based on the filing of an allegedly false misbehavior report.") (citation omitted) ).

Thomas argues that he raised his religious claims during the disciplinary hearing. Specifically, Thomas advised the hearing officer of the significance of his hair style as it relates to his religious beliefs. Dkt. No. 55-2 at 106-108. "The mere utterance of [ ] claims during the course of a disciplinary hearing does not obviate the requirement that [an inmate] file a grievance setting forth a claim which is based upon the same or closely related facts." Bennett v. Fischer, No. 9:09-CV-1236 (FJS/DEP), 2010 WL 5525368, at *6 (N.D.N.Y. Aug. 17, 2010) (citation omitted). Moreover, while Thomas filed an appeal of the disciplinary determination, the appeal included objections to the accusations in the misbehavior report. Dkt. No. 55-2 at 113-14. Notably absent from Thomas' appeal is any claim that Stoughton violated Thomas' religious rights or retaliated against Thomas when he issued the misbehavior report.

In cases in this District with similar factual scenarios, courts have concluded that an appeal of a misbehavior report does not suffice to exhaust religious or retaliation claims, even if that misconduct formed the basis of the disciplinary proceeding. See Bennett, 2010 WL 5525368, at *6 (finding that religious claims raised during the disciplinary hearing and

21

appeal were not properly exhausted); see Crosby v. LaValley, No. 9:15-CV-1125 (BKS/ATB), 2017 WL 7050647, at *6 (N.D.N.Y. Dec. 15, 2017) (finding that retaliation claims related to misbehavior report were not properly exhausted due to the absence of any reference to retaliation in disciplinary hearing transcript or grievances).

Here, Thomas has not asserted any due process claims related to the disciplinary hearing.  Thomas' deposition testimony indicated that he was fully aware of how the grievance process worked.  Dkt. No. 55-2 at 162-165.  Moreover, Thomas was advised by CORC that, "the disciplinary appeal mechanism affords the opportunity to remedy any procedural errors in a disciplinary report."  Dkt. No. 55-9 at 30.  Thus, Thomas has failed to demonstrate that he should be excused from the exhaustion requirement as it relates to his claims against Stoughton.

### b.  Allegation that Grievance Was Not Received

Thomas alleges that he attempted to file a grievance related to the November 9, 2017 incident with LaValley, but that the grievance was intercepted or destroyed by LaValley.  Dkt. No. 60-1 at 11-12.

Administrative remedies may be unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Ross, 136 S. Ct. at 1860.  However, it is well-settled that where an inmate does not receive a response to a grievance, the inmate must appeal to the next level of review notwithstanding the lack of response at the first level of review.  See Khudan v. Lee, No. 12-CV-8147, 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing the plaintiff's complaint where the plaintiff failed to appeal to the next

22

level of review after failing to receive a response on his filed grievance).  Thus, even if an

inmate suspects that his grievances were discarded, he or she must still appeal the

grievance despite the lack of response at the first step of review.  See Chiarappa v. Meyers,

No. 09-CV-607, 2013 WL 6328478, at *5 ( W.D.N.Y. Dec. 5, 2013) ("[E]ven if plaintiff

attempted unsuccessfully to file a grievance in a timely manner, the lack of a response does

not relieve him of the requirement to timely appeal the grievance through all three steps of

the grievance process."); Belile v. Griffin, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086,

at *8 (N.D.N.Y. Feb. 12, 2013), report and recommendation adopted by, 2013 WL 1291720

(N.D.N.Y. Mar. 27, 2013) ("Plaintiff's mere threadbare allegations that his grievances were

intercepted and discarded, without evidence to support such allegation, including any

evidence that identifies which defendant, in particular, is responsible for discarding the

grievances, are insufficient to excuse his failure to comply with the [Inmate Grievance

Program]").

Here, Thomas alleges, with no supporting evidence, that he attempted to file a

grievance regarding the November 9, 2017 incident, but that the grievance was intercepted

by LaValley.  Dkt. No. 60-1 at 11-12.  Thomas claims that he "dropped" the grievance in the

IGRC box at the "460 gate," adjacent to LaValley's "regular" post.  Id.  Thomas alleges that

LaValley has access to the box.  Id. at 11.  Thomas' only support for this accusation is his

own allegations.  Even assuming — as this Court must — that Thomas' allegations are true,

he has still failed to exhaust administrative remedies because he failed to appeal his

grievance to the next level of review.  See Arce v. Keane, No. 01 Civ. 2648, 2004 WL

439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not

excused because he has received no response to his initial grievance").  Thus, Thomas'

accusation that LaValley intercepted his grievance, alone, does not excuse his failure to exhaust administrative remedies.  Thomas' situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable.  See Hill v. Tisch, No. 02CV390, 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable").

Accordingly, as exhaustion is a prerequisite to filing an action in federal court (Woodford, 548 U.S. at 85), it is recommended that Defendants' motion insofar as it seeks dismissal of the claims against Stoughton; claims against LaValley related to the November 9, 2017 incident; and retaliation claims against Delaney, Dupra, LaValley, and Stoughton, for failure to exhaust, be granted.

If it is found that the plaintiff has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice.  Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec's. Dealers, Inc., 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted).  Since "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner . . . can cure the defect by exhausting [the available remedies] and reinstating his suit." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting Snider v. Melindez, 199 F.3d 108, 111-12 (2d Cir. 1999)).  Because the alleged incidents in the underlying action occurred in 2017 and 2018, Thomas' claims are still within the applicable statute of limitations.  Therefore, the undersigned recommends dismissal of the aforementioned claims, without prejudice.

24

## C.  First Amendment Free Exercise

Thomas claims that Defendants confined him to keeplock, directed him to cut his hair, harassed, intimidated, and threatened him in violation of his religious freedom.  See Sec. Am. Compl., generally.  Defendants argue that Thomas' religious claims are subject to dismissal because Defendants' actions did not amount to a substantial burden on Thomas' religious beliefs.  Dkt. No. 55-11 at 18-21.  Defendants also contend that Thomas' religious claims are subject to dismissal because Defendants can demonstrate legitimate penological interests.  Id. at 21-22.

The First Amendment to the United States Constitution guarantees the right to free exercise of religion.  U.S. CONST. amend. I; Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). The free exercise clause applies to prison inmates, subject to appropriate limiting factors. See Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

To make a claim under the First Amendment, the inmate must establish at the threshold that his sincerely held religious beliefs were substantially burdened by the challenged conduct.  Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir.2006) (citing Ford, 352 F.3d at

25

591).  "A substantial burden is more than a mere inconvenience" but "involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs."  Gill v. Defrank, No. 98-CV-7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), aff'd, 8 F. App'x 35 (2d Cir. 2001) (summary order) (citing inter alia Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996)).  The defendants must then identify the legitimate penological interests justifying the challenged conduct.  Salahuddin, 467 F.3d at 274–75.  The burden shifts back to the inmate to show that such interests are irrational.  Id.  In making a reasonable determination,

> The Turner Court determined that the four factors to be considered are considered: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

"The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests."  Benjamin, 905 F.2d at 574 (citations omitted).

For the purposes of this motion, Defendants do not dispute that Thomas' religious beliefs are sincerely held.  Dkt. No. 55-11 at 17.

### 1.  Substantial Burden

Courts have concluded that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.  See Amaker v. Goord, No. 06-CV-490, 2007 WL 4560596, at *6 (W.D.N.Y. Mar. 9, 2007) (citing inter alia Jolly, 76 F.3d at 477).  In assessing religious claims, courts may not "question the centrality

26

of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989)) (internal quotation marks omitted); see also Smith v. Miller, No. 15-CV-9561, 2017 WL 4838322, at *11 (S.D.N.Y. Oct. 23, 2017) (". . . this Court recognizes that '[i]t is not within the judicial ken to question the centrality of a particular beliefs or practice to a faith[.]'").

Here, Defendants argue that Thomas' religious beliefs were not burdened because he was not prevented form practicing his religion.  Dkt. No. 55-11 at 18.  Specifically, Defendants assert that Thomas never cut his hair, rather, he "took his hair out of braids." Id. at 18, 20, 21.

During his February 2018 disciplinary hearing, Thomas testified that hair length and style have important "religious significance" for Rastafarians.  Dkt. No. 55-2 at 108.  Thomas asserts that "[t]he wearing of [b]raids [. . . ] is a 'consecration' and a covenant with God." Dkt. No. 60-1 at 18.  Thomas further avers that wearing braids or dreadlocks is "very holy." Id.  At the time of the incidents with Defendants, Thomas' hair was braided in corn rows because he was, "trying to start [his] dreads."[14]  Dkt. No. 55-2 at 180, 198, 219.  Thomas testified that after the hair is braided, "you have to wait a while for it to - - for it to dread up on its own.  It locks on its own and so I couldn't - - I couldn't dread my hair so I had to take it out[.]" Id. at 180.  After Delaney issued misbehavior reports, Thomas was confined in keeplock, where he was told he would remain until he "took out" his braids.  Id. at 180-81, 238-39.

In this case, viewing the evidence in a light most favorable to the plaintiff, the Court finds

---

[14] In his declarations, Delaney asserts that Plaintiff had "corn row braids that extended below the hairline on the back of his neck."  Dkt. No. 55-3 ¶ 6.

that genuine issues of fact exist as to whether Delaney substantially burdened Plaintiff's religious exercise by forcing him to choose between removing his braids and being subjected to disciplinary punishment.  See Amaker v. Goord, No. 06-CV-490, 2010 WL 2595286, at *8 (W.D.N.Y. Mar. 25, 2010), report and recommendation adopted, 2010 WL 2572972 (W.D.N.Y. June 23, 2010) (holding that forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice); see also May v. Baldwin, 109 F.3d 557, 563 (9th Cir. 1997) ("[W]e will assume that undoing May's dreadlocks imposes a substantial burden on his exercise of Rastafarianism."); see also Stewart v. Berge, No. 05-C-293-C, 2005 WL 1532604, at *6 (W.D. Wis. June 22, 2005), amended sub nom. Stewart v. C.O. Barr, 2005 WL 1648518 (W.D. Wis. July 13, 2005) (allowing the inmate, who was attempting to "start dreadlocks," to proceed with First Amendment claims that the defendants burdened his right to freely exercise Rastafarianism by failing to take him to his urology appointment because he refused to remove his braids).

A different conclusion is reached however, with respect to Dupra and LaValley.  Thomas concedes that he was not compelled to change his hair style or remove his braids after his interactions with Dupra or LaValley.  Dkt. No. 55-2 at 215-16, 233.  Rather, Thomas' allegations against Dupra and LaValley are related to his religious head wear.  At the time of the incidents with Dupra and LaValley, Thomas was wearing a religious crown and claims that Dupra and LaValley directed him to remove the crown, which is a violation of his religious beliefs.  Dkt. No. 55-9 at 31, 45; Dkt. No. 55-2 at 200-02; 219.

Despite Thomas' conclusory assertions, the record lacks any facts establishing that

28

Defendants' substantially burdened Thomas's right to practice his religion when they directed him to remove his crown. Indeed, Thomas does not address or reference the removal of his crown in his opposition to Defendants' motion for summary judgment. Thomas did not explain the significance of wearing the crown, as it relates to his Rastafarian beliefs or why the removal of the crown contradicts those beliefs. Moreover, Dupra and LaValley ordered Thomas to remove his crown on only two occasions. Thomas does not explain why this "interference" was "more than an inconvenience" or a substantial burden on his religion. See Uhuru v. Hart, No. CV 07-07361, 2009 WL 3489376, at *12 (C.D. Cal. Oct. 27, 2009) (dismissing First Amendment claim because the plaintiff could not prove that his sincerely held religious beliefs were substantially burdened when he was required to remove his religious head covering on one occasion). Accordingly, the Court finds that orders by Dupra and LaValley to Thomas to remove his religious crown for an unspecified period of time, do not amount to a "substantial burden" on Thomas' ability to practice his religion.

Construing the pleading liberally, Thomas also claims that his religious rights were violated because Dupra refused to provide his commissary sheet and LaValley temporarily confiscated Thomas' identification card. Dkt. No. 55-2 at 201, 227, 233. Aside from Thomas' conclusory statements, there is nothing in the record showing that these actions substantially burdened Thomas' beliefs. It cannot be said that any inconvenience stemming from the refusal to provide a commissary sheet or three day loss of his identification card was beyond de minimis and a substantial burden that forced Thomas to "modify his behavior and violate his beliefs." Gill, 2000 WL 897152, at *1; Neal v. Byrne, No. 06-CV-6250CJS, 2009 WL 3254908, at *6 (W.D.N.Y. Oct. 7, 2009) (refusing to find that the plaintiff's inability to purchase Muslim oils through the mail amounted to a substantial burden).

29

Accordingly, Thomas' free exercise claims against Dupra and LaValley should be dismissed and Defendants' motion on this ground should be granted.

## 2. Legitimate Penological Interest

Once a plaintiff meets his burden of showing a substantial burden upon his exercise of sincerely held religious beliefs, the burden shifts to the defendants to demonstrate that they had a legitimate penological purpose. See Salahuddin, 467 F.3d at 274. If a legitimate penological purpose is identified, the Court must then assess its reasonableness under the Turner factors set forth above. See subsection III.C., supra.

DOCCS' Director of the Crisis Intervention Unit ("CIU"), Scott Kelly ("Kelly"), declared that Dir. #4914 regulates grooming standards as "custom hairstyles which include prohibited braids and corn rows, can be used to conceal contraband." Dkt. No. 55-8 at ¶ 9. Kelly avers that the provision, "serves several important penological interests and helps thwart and/or lessen breaches in prison security and the potential for inmate disputes and prison violence." Id. ¶ 8. Kelly notes that "cornrows tight to the scalp are easily viewed for the presence of contraband, braids severely limit the inspection procedure, impending correction staff in their efforts. Id. at ¶ 9. Thus, because "[p]reventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the Turner . . . standard," Defendants have set forth a legitimate penological interest. Benjamin, 905 F.2d at 578.

### 3.  Rationality of Defendants' Actions

Because Defendants have articulated a legitimate penological interest, the burden shifts

to Thomas to demonstrate that Defendants' concerns are "irrational."   "When determining

whether the burden imposed by the defendants is reasonable rather than irrational, a court

evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate

governmental objective; (2) whether the prisoner has an alternative means of exercising the

burdened right; (3) the impact on guards, inmates, and prison resources of accommodating

the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of

the right that have only a de minimis adverse effect on valid penological interests." DeBlasio

v. Rock, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *23 (N.D.N.Y. Sept. 26, 2011)

(citing Salahuddin, 467 F.3d at 274-75).

Here, Thomas argues that Directive #4914 impermissibly infringes upon his First

Amendment right to exercise his religious beliefs.  Dkt. No. 60-1 at 18.  Thomas reasons that

the policy regarding corn rows or braids is irrational in comparison with the policy related to

dread locks.  Specifically, Dir. #4914 allows Rastafarians to grow and maintain dread locks,

but it does not "allow him to do the things required to begin growing his dread locks." Id. at

20.  Thomas also claims that corn rows or braids impose no more of a threat to security than

dread locks, which are allowed at any length and diameter.  Id.  Indeed, Thomas maintains

that some inmates have dread locks that are ten to twelve inches in diameter and extend

beyond the inmate's waist line.  Id.  Moreover, inmates with dread locks are permitted to wear

their hair in a religious covering or crown, which eliminates an officer's ability to visually

inspect the hair unless the inmate removes the crown.  Dkt. No. 60-1 at 20.  As an

alternative, Thomas suggests that correctional staff utilize hand held metal detectors to scan

31

an inmate's hair.  Dkt. No. 60-1 at 23.

Viewing the evidence in a light most favorable to Thomas as the non-moving party, and mindful of his status as a pro se plaintiff, the undersigned concludes that Thomas has raised a triable issue of fact regarding the reasonableness of Directive #4914.  See Smith v. Artus, No. 9:07-CV-1150 (NAM/ATB), 2010 WL 3910086, at *16 (N.D.N.Y. Sept. 30, 2010) (holding that the "plaintiff put forth enough evidence for a reasonable jury to conclude that the defendants' concerns are irrational or are an exaggerated response to those concerns.")), vacated in part, 522 F. App'x 82 (2d Cir. 2013) (summary order).

Accordingly, the undersigned recommends that Defendants' motion on this ground be denied as to Delaney, and granted as to LaValley and Dupra

## D.  RLUIPA Claims

Thomas asserts RLUIPA claims against Dupra, Delaney, and LaValley in their official capacities, and seeks injunctive and declaratory relief.  See generally Sec. Am. Compl.  The principles which guide the analysis of a free exercise claim are similar to those applicable to an RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks.  See Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006).

RLUIPA provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling

32

governmental interest.

42 U.S.C. § 2000cc–1(a).

In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.  The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct."  Salahuddin, 467 F.3d at 274-75.

> Congress, in enacting the RLUIPA, anticipated that Courts would give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources. Nevertheless, prison officials cannot simply use the words "security" and "safety," and expect that their conduct will be permissible.

Singh v. Goord, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007) (internal citations omitted).  "As a general matter, RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment."  Jova v. Smith, 582 F.3d 410, 415 (2d Cir. 2009).

Presently, Thomas is incarcerated at Coxsackie Correctional Facility.  Dkt. No. 66.  Thus, any claim for injunctive relief against the Clinton C.F. defendants is moot.  See Brandon v. Schroyer, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *9 (N.D.N.Y. Feb. 26, 2016), report and recommendation adopted, 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016) (citing Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011)) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.").  Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of Thomas' RLUIPA claims be granted.

### E.  First Amendment Retaliation[15]

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga Cty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y.).  Therefore, conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).  If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity.  See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009).  In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003).  "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper

---

[15]  Again, plaintiff asserted in his opposition that he is not pursuing retaliation claims against Delaney or Dupra.  See Dkt. No. 60-1 at 13, 15.

reasons alone." Jackson, 549 F.Supp.2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682.   A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).   "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. N.Y.,477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).   "Temporal proximity between the protected activity and the adverse [ ] action 'must be very close.'" Meyer v. Shulkin, 722 F. App'x 26, 28 (2d Cir. 2018) (summary order) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases.  However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

### 1. LaValley

Thomas claims that, on November 9, 2017, LaValley called him names and harassed him in retaliation for Thomas' October 2017 grievance against LaValley.  Dkt. No. 60-1 at 11.

Thus, the Court finds that Thomas engaged in protected conduct.  With respect to the

second prong of the analysis, Thomas testified that LaValley stopped him while he was

walking through the four-sixty gate area and called him "unappropriate [sic] names like little

[expletive] and little [expletive].  He also state[d], you like putting stuff on paper, do it again

and see what happens[.]"  Dkt. No. 55-2 at 227.  LaValley did not issue a misbehavior report.

Id. at 229.

Verbal harassment and threats are generally not considered conduct "that would

deter a similarly situated individual of ordinary firmness of exercising constitutional rights."

Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr.30,

2009) (citing Gill, 389 F.3d at 380) (additional citation omitted).  "[H]arassing comments and

hostile behavior do not constitute adverse actions sufficient to state a retaliation claim."

Quezada v. Roy, No. 14 Civ. 4056, 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015)

(citation and internal quotation marks omitted).  "The line between de minimis verbal

harassment and retaliatory adverse action . . . [hinges] on the specificity and seriousness of

the words used."  Id.

Even accepting Thomas' allegations as true, LaValley's statements are not sufficiently

specific to constitute adverse action.  See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL

1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections

officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387

F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told

an inmate that he would "have to pay the consequences" for filing a grievance against her).

Mindful that inmates "may be required to tolerate more than average citizens[ ] before a

retaliatory action taken against them is considered adverse," Davis, 320 F.3d at 353, the

undersigned concludes that LaValley's statements constitute vague threats that lack the specificity and seriousness "to deter an inmate from exercising his First Amendment rights" as no real threat exists.  Id.; cf. Hill v. Laird, No. 06-CV-0126, 2016 WL 3632707, at *4 (W.D.N.Y. July 6, 2012) (denying summary judgment and, absent injury, finding a threat sufficiently specific where the defendant threatened, "say I found this [noose], you were trying to hurt yourself so I had to rush in and stop you . . . [y]our arm might be broken in a few places for a long time" if the plaintiff continued to file grievances); Lunney v. Brureton, No. 04 Civ. 2438, 2007 WL 1544629, at *19 (S.D.N.Y. May 29, 2007) (denying summary judgment where, absent injury, the defendant threatened that he would break the plaintiff's neck if he continued to write grievances).

Accordingly, it is recommended that Defendants' motion on this ground be granted as to LaValley.


### 2.  Crowningshield

Thomas testified that Crowningshield approached him in the yard on May 18, 2018 and directed him to turn over his identification card.  Dkt. No. 55-2 at 255.  Thomas further testified that Crowningshield stated: ". . . you're the one suing my friends.  I don't like you or your kind.  I'm keeping your ID for a month so don't try to get a new one because if I see you outside again that will be the last time anybody will see you."  Id.  Crowningshield did not issue a misbehavior report and, three days later, Thomas received a new identification card. Id. at 257.

Even assuming the truth of the allegations, "[t]he law is clear that under most circumstances, including those here, a single instance of confiscation does not constitute an

37

adverse action for the purposes of a retaliation claim." Shannon v. Venettozzi, No. 13 CIV. 4530, 2015 WL 114179, at *6 (S.D.N.Y. Jan. 8, 2015) (dismissing retaliation claim reasoning that the plaintiff was not deterred by the confiscation of magazines from exercising his First Amendment because he filed a complaint, ten days later), vacated in part on other grounds 670 F. App'x 20 (2d Cir. 2016) (summary order); Quezada, 2017 WL 6887793, at *13 ("The defacement and temporary confiscation of Plaintiff's I.D. card is not an adverse action that is sufficient to prevail on a claim of retaliation.").

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of the retaliation claims against Crowningshield be granted.

## F. Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  Dkt. No. 55-11 at 32. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation.  See

38

Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, while Defendants summarize general caselaw, the argument in support of the qualified immunity defense is one paragraph long, entirely conclusory, and unsupported by any facts.  Indeed, Defendants do not specify for which constitutional claim they are entitled to qualified immunity.   Accordingly, it is recommended that Defendants' motion, on this ground, be denied.  See Roberts v. Hobbs, No. 5:10-CV-00174, 2010 WL 5888777, at *6 (E.D. Ark. Nov. 8, 2010) (summarily denying dispositive motion containing unsupported and conclusory qualified immunity arguments that fail to address the particular facts of the case or cite any relevant cases).[16]

### III.  Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 55) be **GRANTED** as to (a) Defendants' exhaustion defense as it relates to (i) claims against Stoughton; (ii) claims against LaValley (related to the November 2017 incident); and (iii) retaliation claims; (b) First Amendment free exercise claims against Dupra and LaValley; (c) RLUIPA claims; and (d) retaliation claims against Delaney, Dupra, and Crowningshield; and it is

---

[16]     As the undersigned recommends granting summary judgment dismissing the the retaliations claims, the undersigned declines to address Defendants' alternative argument that they would have taken the same actions in the absence of protected conduct.

39

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 55) be

**DENIED** as to (a) Plaintiff's First Amendment free exercise claim against Delaney; and (b)

Defendants' qualified immunity defense; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the

parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days

within which to file written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**(14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89

(2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[17]

Dated: August 13, 2019
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[17] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).